Approved: _____
Kan M. Nawaday / Lauren B. Schorr / Russell Capone
Assistant United States Attorneys

Before:     HONORABLE BARBARA C. MOSES
            United States Magistrate Judge
            Southern District of New York

ORIGINAL

DCC #____

**17 MAG 4096**

- - - - - - - - - - - - - - - - - - - x
                                       :    **SEALED COMPLAINT**
UNITED STATES OF AMERICA               :
                                            Violation of
         - v. -                        :    18 U.S.C. § 1343.
                                       :
JASON NISSEN,                               COUNTY OF OFFENSE:
                                       :    NEW YORK
              Defendant.
                                       :
- - - - - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

      JOSEPH DOWNS, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI") and charges as follows:

### COUNT ONE
### (Wire Fraud)

      1.  From at least in or about 2015, up to and including in or about 2017, in the Southern District of New York and elsewhere, JASON NISSEN, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, willfully and knowingly did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, NISSEN solicited tens of millions of dollars from lenders by falsely representing that NISSEN would use the lenders' money to purchase and re-sell wholesale quantities of premium tickets for sporting and entertainment events, when, in truth and in fact, NISSEN used the lenders' money to repay other lenders and enrich himself.

      (Title 18, United States Code, Section 1343.)

The bases for my knowledge and the foregoing charges are, in part, as follows:

2. I have been a Special Agent with the FBI for approximately 12 years. I am currently assigned to a public corruption squad in the FBI's New York Field Office. As a Special Agent, I have participated in investigations involving financial crimes and fraud.

3. Since at least in or about 2016, I have been involved in an investigation of JASON NISSEN, the defendant, and his ticket resale business.

4. The information contained in this affidavit is based upon my personal knowledge, as well as information obtained during this investigation, directly or indirectly, from other sources and agents. Because this affidavit is prepared for limited purposes, I have not set forth each and every fact I have learned in connection with this investigation. Where conversations and events are referred to herein, they are related in substance and in part.

## Relevant Individuals and Entities

5. Based on my participation in this investigation and my review of publicly-available information relating to JASON NISSEN, the defendant, I have learned the following, in substance and relevant part:

### *JASON NISSEN, the defendant*

a. Since at least in or about 2012, NISSEN has operated a ticket resale business (the "Ticket Company") through which NISSEN purchased large quantities of premium tickets for sporting and entertainment events, and then resold such tickets for a profit.

### *The Ticket Company*

b. The Ticket Company is a ticket resale business located in Manhattan, New York, of which NISSEN was the chief executive officer and president. NISSEN ran the daily operations of the Ticket Company and had control of the Ticket Company's bank accounts. As described herein, NISSEN owned 76% of the Ticket Company through two holding companies owned and

2

controlled by NISSEN ("Holding Company I" and "Holding Company II"). As further explained below, the remaining 24% of the Ticket Company was sold by NISSEN to a private equity investment fund referred to herein as "Victim-1."

        c.    The Ticket Company's website states that "[The Ticket Company] is an industry leader in providing VIP access and premium tickets to all concerts, Broadway theatre, red carpet premieres and sporting events worldwide . . . the Ticket Company stocks one of the largest revolving inventories for sports, concerts, and theatre worldwide."

### *Holding Company I*

        d.    Holding Company I is wholly owned and controlled by NISSEN and is the holding company through which NISSEN owned 75% of the Ticket Company.

### *Holding Company II*

        e.    Holding Company II is wholly owned and controlled by NISSEN and is the holding company through which NISSEN owned 1% of the Ticket Company, bringing his total ownership of the Ticket Company to 76%.

### The Defendant's Fraudulent Scheme

### *Overview of the Scheme*

        6.    As detailed below, from at least in or about 2015 to in or about May 2017, JASON NISSEN, the defendant, defrauded multiple victims of tens of millions of dollars through the Ticket Company and Holding Company I. NISSEN represented to victims that he would use money lent to him and his companies by victims to purchase bulk quantities of premium tickets to sporting and entertainment events such as the Super Bowl (Football), the World Cup (Soccer), the U.S. Open (Tennis), and Hamilton (Broadway musical), and then resell the tickets at a profit. However, in truth and in fact, NISSEN used the victims' money in large part to repay other victims and to enrich himself.

        7.    To further perpetuate his fraudulent scheme and to raise additional sums from victims, JASON NISSEN, the defendant, among other things, falsified financial documents and inflated accounts receivable ledgers, which NISSEN presented to

certain victims as purported proof that their money was being used to purchase premium tickets for resale.

8. On or about May 7, 2017, unable to obtain more financing to continue the scheme through existing or new victims, JASON NISSEN, the defendant, admitted to one of his victims, referred to as Victim-2 herein, that he had been operating a Ponzi scheme.

9. Three days later, on or about May 10, 2017, JASON NISSEN, the defendant, told Victim-1 that he had been committing a fraud and that the income numbers of the Ticket Company that he had been reporting to Victim-1 were fabricated.

10. In total, JASON NISSEN, the defendant, defrauded victims of at least $70 million.

### The Defendant Obtained $40 Million from Victim-1 in 2015

11. In speaking with a partner ("Partner-1") and a vice president ("VP-1") of Victim-1, I have learned the following, in substance and relevant part:

   a. Victim-1 is a private equity investment fund that provides financing to privately-held companies.

   b. In or about 2015, Victim-1 entered into a credit agreement with JASON NISSEN, the defendant, and the Ticket Company, in which the Ticket Company issued debt notes (the "Notes") to Victim-1 in exchange for, among other things, $40 million in financing from Victim-1.[1]

   c. In exchange for that financing, which consisted of two rounds of funding -- an initial funding of $25 million and a second funding of $15 million -- Victim-1 obtained, in addition to the payment of principal and interest, a 24% equity stake in the Ticket Company. The remaining 76% of

---

[1] As explained to me by Partner-1 and VP-1, and from my review of the financing documents, as part of the $40 million financing, the Ticket Company was restructured to create a holding company in which Victim-1 had a 24% interest and JASON NISSEN, the defendant, had a 76% interest through Holding Company I and Holding Company II. That holding company in turn wholly owned a subsidiary company that was created for purposes of providing the financing for the deal (the "Intermediate Company"). The Intermediate Company issued the debt notes to Victim-1 that was part of the financing. In addition, the operating company that ran the ticket business, i.e. the Ticket Company, was in turn wholly-owned by the Intermediate Company.

the Ticket Company was owned by Holding Company I and Holding Company II. As previously described, Holding Company I and Holding Company II were wholly-owned and controlled by NISSEN.

    d. The Notes required NISSEN and the Ticket Company to keep Victim-1 abreast of the Ticket Company's financial performance until Victim-1 was repaid per the terms of the credit agreement. In that regard, NISSEN and the Ticket Company were required, among other things, to provide Victim-1 with monthly, quarterly, and annual financial reports that were to include, among other things, consolidated statements of income and cash flow.

    12. I have reviewed the credit agreement relating to the $40 million financing from Victim-1 and its accompanying schedules (the "Credit Agreement"), and have learned that the Credit Agreement provided that the net proceeds of the financing were to be used as follows: (i) about $6.9 million was to be used to "pay off" a prior lender; (ii) about $1.6 million was to be used for transaction expenses related to financing the transaction; (iii) up to $200,000 was to be used to pay employee salary expenses; and (iv) the remainder of the net proceeds, i.e., about $30 million, was to be used "for the purchase of ticket inventory."

## The Defendant Obtained Approximately $32 Million from Victim-2 through Multiple Transactions from 2016 to 2017

    13. I have learned the following, in substance and relevant part, from (i) speaking with an executive ("Executive-1") of Victim-2; (ii) speaking with and reviewing notes by an FBI agent who has spoken to the chief financial officer ("CFO-1") of Victim-2; (iii) reviewing loan agreements and documents provided to me by Victim-2; and (iv) reviewing bank records of accounts belonging to JASON NISSEN, the defendant, Holding Company I, the Ticket Company, and Holding Company II:

    a. Victim-2 is a diamond wholesaler with an office in Manhattan, New York.

    b. In or about the Summer of 2016, NISSEN approached Executive-1 about making loans to his company, Holding Company I, which NISSEN stated would be used to purchase premium sporting and entertainment event tickets in bulk to be resold at a profit. Approximately two years earlier, Victim-2

had entered into similar loan agreements with NISSEN, which NISSEN had repaid.

    c. Executive-1 agreed and as a result, from the Summer of 2016 through at least in or about April 2017, Victim-2 entered into multiple loan transactions with Holding Company I and NISSEN. Each of the transactions was structured as a short-term loan that was to be used to purchase tickets for a specific event such as, for example, tickets for the Super Bowl, a concert by the singer Adele, and the musical "Hamilton." Upon the loan's maturity, Holding Company I and NISSEN were to pay back to Victim-2 the principal and either interest or a percentage of profits earned on the resale of the tickets to the particular event.

    d. For example, in or about October 2016, Victim-2 wired $1,921,750 to Holding Company I to be used to purchase tickets for a UFC fight held in New York. Similarly, in or about March 2017, Victim-2 wired $950,000 to Holding Company I to be used to purchase tickets for the NCAA March Madness Basketball Tournament.

    e. To memorialize the transactions with Victim-2, NISSEN signed a promissory note as the president and chief executive officer of Holding Company I. He also signed a personal guarantee.

    f. From in or about the Summer of 2016 through in or about April 2017, Victim-2 lent NISSEN and Holding Company I at least approximately $32 million, all of which was to be used to purchase tickets in the manner described above.

    g. To date, Victim-2 has not been repaid approximately $16 million.

### The Defendant Obtained a $4 million Bridge Loan from Victim-1 in April 2017

  14. In speaking with Partner-1 and VP-1 of Victim-1, which as noted above is a private equity investment fund with an office in Manhattan, New York, and in reviewing the amendment to the Credit Agreement discussed below, I have learned the following, in substance and relevant part:

    a. In or about April 2017, JASON NISSEN, the defendant, approached representatives of Victim-1 to request a

short-term loan of $4 million for the Ticket Company (the "April 2017 Bridge Loan"). NISSEN told Victim-1 that the April 2017 Bridge Loan would be used to purchase a large block of tickets for the 2017 U.S. Open Tennis Tournament, which NISSEN and the Ticket Company would resell at a profit.

   b. Victim-1 agreed and entered into a loan agreement, which was structured as an amendment to the Credit Agreement, through which Victim-1 gave the Ticket Company $4 million to purchase U.S. Open Tennis Tournament tickets in exchange for debt notes, which initially paid a monthly interest of 1.5%.

### The Defendant Admitted to Committing Fraud to Executive-1

  15. In speaking with Executive-1 from Victim-2, I have learned the following, in substance and relevant part:

   a. On or about the evening of May 7, 2017, JASON NISSEN, the defendant, called Executive-1 and told Executive-1 that he needed to speak with Executive-1. Later that evening, NISSEN came to Executive-1's home and they met outside.

   b. While walking outside, NISSEN told Executive-1, in substance and relevant part, that NISSEN had lied to Executive-1 about "everything"; that he was running a Ponzi scheme and had lost all the money invested with him; and that he did not buy tickets with the money lent to him by Victim-2 but instead used the money to pay other people to whom he owed money.

   c. Executive-1 was shocked by what NISSEN told him and returned inside his home. Later that evening, Executive-1 called NISSEN and recorded their telephone conversation without NISSEN's knowledge.

  16. I have reviewed the audio recording of the telephone call between Executive-1 and JASON NISSEN, the defendant, from May 7, 2017. During that telephone call, the following exchange occurred:

    Executive-1: You [referring to NISSEN] came to my office. I haven't seen you in two years. You came to my office. You told me you had a good deal to be made.

NISSEN: I do have a good deal.

Executive-1: What good deal? You're just telling me that the deal that you so called put on the table was a third or a fifth of the reality so you came knowingly that you are coming to take money from me to pay other people to defraud me.

NISSEN: No, the first deal probably not. But the other ones after that, yeah.

\*   \*   \*

Executive-1: Let me understand something. The Hamilton [referring to a deal to purchase tickets for the musical, Hamilton] ... The reports that you showed us in the return, it was all fake?

NISSEN: No. Some of it was real and some of it was fake.

Executive-1: Some of it real, some of it fake. And-

NISSEN: The numbers are just all multiplied. It's the real numbers, but multiplied.

Executive-1: Hold on. Hold on, let me understand something. The UFC was real or fake?

NISSEN: Half real, half fake.

Executive-1: Half real, half fake. Which is the half that you-

NISSEN: You understand? They're inflated numbers. We really had those events and really sold the tickets and they're inflated, you know, two to three fold depending on how it was.

17.   During the above-quoted conversation, JASON NISSEN, the defendant, and Executive-1 agreed that NISSEN would

8

come to Victim-2's office with documents, such as bank records, and meet with Executive-1 and CFO-1 to further explain what NISSEN had done with the money lent to NISSEN's ticket business by Victim-2 and others.

### *May 8, 2017 Meeting at Victim-2's Offices*

18. In speaking with Executive-1 and CFO-1, and through my review of a video recording made by Victim-2 of the May 8, 2017 meeting with Executive-1, CFO-1, other associates of Victim-2, and JASON NISSEN, the defendant, at Victim-2's offices, I have learned the following, in substance and relevant part:

   a. On the morning of May 8, 2017, NISSEN came to see Executive-1 and other associates of Victim-2, including CFO-1, at Victim-2's office.

   b. Unbeknownst to NISSEN, Victim-2 made a video recording of the meeting.

   c. During the course of the meeting, NISSEN tried to convince Executive-1 and CFO-1 to give him more money in order to pay off his debts in exchange for Victim-2 taking ownership of the Ticket Company.

   d. NISSEN explained his fraud to Executive-1 and CFO-1, noting, among other things, that NISSEN had inflated the amount of tickets he was actually purchasing and that he had used Victim-2's money in large part to pay others to whom NISSEN owed money.

   e. NISSEN identified other victims of his fraud such as (i) Victim-1, who NISSEN stated was owed about $44 million, and (ii) a fund ("Fund-1"), which also lent money to NISSEN and which NISSEN estimated was owed about $11 million.

   f. NISSEN also admitted to forging documents that he had previously provided to Victim-2. For example, when a payment had been due from NISSEN to Victim-2 on one of the ticket deals, NISSEN falsely told Victim-2 that he had wired the payment to Victim-2. When the money did not arrive in Victim-2's account, Executive-1 contacted NISSEN, and NISSEN told Executive-1 that the bank had mistakenly wired the money to another account and that the bank would resolve the issue.

NISSEN then forwarded to Victim-2 a copy of his bank account statement, which appeared to show the missing wire.

        g.    During the May 8 meeting, CFO-1 confronted NISSEN about that bank statement:

> CFO-1: So, what, what's the story? Did you bring the bank statements?
>
> NISSEN: Yeah, I got em. Yeah.
>
> CFO-1: So let me ask you a question. The bank statement that you sent us last week, has 400 [inaudible]. What, the guy from the bank helped you to forge it?
>
> NISSEN: No, I did that.
>
> CFO-1: You did that?
>
> NISSEN: Oh yeah, I had a [inaudible] before balanced checks, so I just changed it.
>
> CFO-1: You changed it?
>
> NISSEN: Yeah, I changed it.
>
> CFO-1: How did you change it?
>
> NISSEN: Photoshop. You ever hear of it?

        h.    During this meeting, NISSEN also relayed to Executive-1 and CFO-1 that if they did not help him by giving him more money, NISSEN would go to jail.

        i.    The following colloquy also occurred during this meeting:

> Executive-1: You came to me last night at 8:30 at night to tell me you ran a Ponzi scheme, and now you're like telling me, buying, selling. Who's buying, who's selling? I'm like, somebody dropped a bomb on my head.
>
> NISSEN: Right.

10

         \*  \*  \*

| | |
|---|---|
| CFO-1: | You were running a Ponzi scheme. |
| NISSEN: | I guess you want to call it ... I was borrowing from Peter to pay Paul. |
| CFO-1: | Yeah. That's the definition of a Ponzi. |

**The Defendant Admits to Committing Fraud and Falsifying Financial Information of the Ticket Company to Partner-1**

  19. In speaking with VP-1 of Victim-1, I have learned the following, in substance and relevant part:

  a. On or about May 10, 2017, VP-1 received a telephone call from the chief financial officer of the Ticket Company ("CFO-2") and a lawyer for the Ticket Company. CFO-2 informed VP-1 that JASON NISSEN, the defendant, had told CFO-2 that the accounts receivable ledgers of the Ticket Company were fake.

  b. VP-1 then called Partner-1 and relayed to Partner-1 what he had heard from CFO-2.

  20. In speaking with Partner-1, I have learned the following, in substance and relevant part:

  a. After receiving the telephone call described above from VP-1, Partner-1 spoke with JASON NISSEN, the defendant, by telephone.

  b. During that conversation, NISSEN told Partner-1 that (i) he had been engaging in a fraud, (ii) he had been fabricating the accounts receivable numbers of the Ticket Company that were being reported to Victim-1, and (iii) he only used about 20% of the $4 million bridge loan from Victim-1 to buy U.S. Open Tennis Tournament tickets and that he had used the rest of the money to pay debts owed to others.

**Bank Documents**

21.  I have reviewed bank records belonging to JASON NISSEN, the defendant, Holding Company I, Holding Company II, and the Ticket Company.  Those records show that NISSEN used money he received as investments in his ticket business in large part not to purchase tickets but rather to pay other lenders to his business and to enrich himself.  Below are several examples of how NISSEN unlawfully disposed of money he fraudulently obtained from his victims:

*The Defendant's Unlawful Use of $1,921,750 from Victim-2, Which Was To Be Used for the Purchase of UFC Tickets*

a.  Holding Company I's bank records show that on or about October 6, 2016, Victim-2 wired $1,921,750 to Holding Company I.  As described above in paragraph 13(d), Victim-2 wired this money to Holding Company I for the purchase of tickets to a UFC fight in New York to be resold by NISSEN and Holding Company I.

b.  According to Holding Company I's bank records, before the $1.9 million wire transfer from Victim-2, there was only $4,755.39 in that Holding Company I bank account.

c.  After the approximately $1.9 million wire transfer from Victim-2 into the Holding Company I account, NISSEN made the following transactions out of the account that same day: (i) two cash withdrawals – one for $20,000 and the other for $23,250; (ii) a transfer of $383,000 to the bank account of Holding Company II, which is wholly controlled by NISSEN; and (iii) a transfer of $1,500,050 to NISSEN's personal bank account.

d.  At the time of the $383,000 transfer of Victim-2's money into the bank account of Holding Company II, that account had a *negative* balance of about $382,000.  The infusion of the $383,000 from Victim-2 brought the balance of the Holding Company II account to a positive balance of about $578.

e.  At the time of the $1,500,050 transfer of Victim-2's money to NISSEN's personal bank account, that account had a balance of about $88.

f. After the infusion of that $1,500,050 transfer of Victim-2's money into NISSEN's personal account, that same day, NISSEN transferred $1,500,025 to Fund-1.

g. As noted above in paragraph 18(e), NISSEN identified Fund-1 as a victim who had lent money to NISSEN and Holding Company I and to which he owed approximately $11 million.

h. I have reviewed the website of Fund-1, which describes Fund-1 as an asset-based lender.

i. The foregoing movement of funds shows that most, if not all, of Victim-2's approximately $1.9 million investment was not used by NISSEN to purchase tickets, as per the terms of his agreement with Victim-2.

### *The Defendant's Unlawful Use of $950,000 from Victim-2, Which Was To Be Used for the Purchase of March Madness Tickets*

j. Holding Company I's bank records show that on or about March 15, 2017, Victim-2 wired $950,000 to Holding Company I. As described above in paragraph 13(d), Victim-2 wired this money to Holding Company I for the purchase of tickets to the March Madness Basketball Tournament to be resold by NISSEN and Holding Company I.

k. Holding Company I's bank records show that before the $950,000 wire transfer from Victim-2, there was only $6,161.92 in that Holding Company I bank account.

l. That same day, on March 15, 2017, NISSEN transferred $835,000 of Victim-1's $950,000 to Holding Company II's bank account. At the time of the transfer, Holding Company II's account had a balance of about $15,000. NISSEN then transferred $850,000 to Fund-1.

m. The foregoing movement of funds shows a significant portion of Victim-1's $950,000 was not used by NISSEN to purchase tickets.

### *The Defendant's Unlawful Use of the $4 million Bridge Loan from Victim-1, Which Was to be Used to Purchase U.S. Open Tennis Tournament Tickets*

n. The Ticket Company's bank records show that Victim-1 wired $4 million to the Ticket Company on or about April 11, 2017. This was the April 2017 Bridge Loan. At the time of the $4 million transfer, the Ticket Company bank account had a balance of approximately $100,000.

o. A significant portion of the $4 million from Victim-1 was not used to purchase U.S. Open Tennis Tournament Tickets. For example, that same day, April 11, 2017, NISSEN transferred $2 million of the $4 million loan from Victim-1 to NISSEN's personal bank account. At the time, NISSEN's personal bank account had a balance of about $934,000.

p. After the $2 million transfer of Victim-1's money into his personal account, NISSEN then made two transfers totaling $2.65 million to Victim-2.

q. The next day, April 12, 2017, the Ticket Company account had a balance of $2.1 million, most of which appears to be the balance of the approximately $2 million from Victim-1 that remained in this account.

r. On April 12, NISSEN made three transfers totaling $1.85 million from the Ticket Company bank account to his personal bank account. At the time, NISSEN's personal bank account had a balance of about $189,000.

s. Later that day, NISSEN transferred $1.45 million to an entity ("Lender-1").

t. Based on my investigation, including my discussions with an individual who owns and controls Lender-1 ("Individual-1"), I have learned, in substance and relevant part that: (i) Lender-1 is wholly owned and controlled by Individual-1; and (ii) Lender-1 has lent money to NISSEN to invest in the purchase of tickets for specific events in return for the repayment of principal and interest.

u. The foregoing movement of funds shows that a significant portion of Victim-1's $4 million April 2017 Bridge Loan was not used by NISSEN to purchase tickets.

**Interstate Wires**

      22.    In speaking with a forensic accountant of the FBI, who has spoken to a bank representative of the bank used by the Ticket Company, Holding Company I, and Holding Company II, I have learned, in substance and relevant part, that wire transfers from Victim-1 and Victim-2 into the bank accounts of the Ticket Company, Holding Company I, and Holding Company II traveled across state lines.

      WHEREFORE, the deponent prays that an arrest warrant be issued for JASON NISSEN, the defendant, and that he be imprisoned or bailed as the case may be.

_____
JOSEPH DOWNS
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

Sworn to before me this
30th day of May, 2017

_____
THE HONORABLE BARBARA C. MOSES
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

15