## BACHNER & ASSOCIATES, P.C.
ATTORNEYS AT LAW
39 BROADWAY
SUITE 1610
NEW YORK, NEW YORK 10006

TELEPHONE: (212) 344-7778
FACSIMILE: (212) 344-7774

MICHAEL F. BACHNER*

SCOTT J. SPLITTGERBER**
HOWARD WEINER***

*ALSO ADMITTED IN NJ
**ALSO ADMITTED IN ILLINOIS
***ALSO ADMITTED IN CALIFORNIA AND NJ

www.bhlawfirm.com
www.bachnerlaw.com

NEW JERSEY OFFICE
175 FAIRFIELD AVENUE
SUITE 3D
WEST CALDWELL, N.J. 07006
TEL: (973) 403-9550

September 20, 2018

**VIA ECF**
Hon. Paul E. Engelmayer
United States District Court Judge
Southern District of New York
40 Foley Square
New York, NY 10007

Re:   U.S. v. Jason Nissen, 17-cr-477 (PAE)

Dear Judge Engelmayer:

This letter is in response to the contentions made by the Government in its letter of September 18, 2018, and is intended to provide a summary of the arguments we intend to make tomorrow.

### Preliminary Remarks

As noted in our sentencing memorandum, Jason Nissen voluntarily met with the Trustee and the Receiver, and otherwise communicated with them to aid in their investigations. We estimate Jason spent well over 20 hours in that effort. In his meetings, Jason has been open and candid and has been available whenever called. In addition, prior to Jason's arrest, he met with the Government to explain his conduct and has remained available to meet them to answer any questions. All of Jason's financial records, including his personal bank statements and credit card receipts were provided to the Government, the Trustee and the Receiver (either through subpoena or voluntarily). Moreover, Haydee Nissen voluntarily provided her bank records and credit card statements to the Trustee, and was ready, willing and able to meet with them (or with the government) to answer any questions. No request was made of her by any party.[1]

---

[1] The Trustee and Receiver have also been in frequent contact with the government. Weeks ago, Jason and his bankruptcy counsel volunteered to go through his statements

BACHNER & ASSOCIATES, P.C.

Not until the irresponsible innuendos of theft made by Taly, which the government now admits was based upon suspicion and "no proof," was the defense ever advised that there was any issue regarding Mr. Nissen's or his wife, Haydee's diversion of money for personal use.[2]

### The Government's Letter

#### a. Deposits and Disbursements

The government notes that between June of 2011 and July 2017, there was approximately $53,795,745 in cash disbursement from the NEA accounts – about $19,001,489 in deposits and $72,796,745 in withdrawals. We address their figures below seriatim.

   a. **Disbursements to Jason Nissen totaled $34,543,409 – with $9,2742,027 during the time period charged in the indictment.**

We remind the Court that prior to Falcon's loans to NECO, Falcon assiduously went through NECO's books and records where these types of cash disbursements historically occurred and were explained. After Falcon's loan, nothing changed in regards to the legitimate manner in which tickets were purchased and sold by NECO. All deposits into and withdrawals from Jason's personal account, or cash withdrawals from NECO, were transacted for the following:

1. Many of the ticket vendors and investors did not want to receive payment in the form of a corporate check. These vendors often resold tickets not intended for resale (e.g. professional athletes; promoters; U.S. Open tickets; Live Nation concert tickets) and simply wanted to be paid either in cash or by personal check in order to avoid having a corporate record from a ticket broker of the transaction. Accordingly, funds were wired or deposited into Jason's personal account from one of the corporate accounts to pay these individuals.[3]
2. Thousands of tickets, worth many millions of dollars, were purchased on the personal credit cards, generally AMEX, of friends and family. Jason (NECO) was concerned that should the credit card companies see large payments coming from a single account (NECO) to pay these bills, they would limit the buying power on all of the cards due to the risk of having only one payer. Accordingly,

---

with the Trustee to prove that he had no personal benefit. I am told that the overture was rejected.

[2] Since his arrest, Jason has been adamant that his crime was not predatory or motivated by personal enrichment. Indeed, Jason insisted that the language to "enrich himself" be removed from the plea agreement and from his plea allocution. The government agreed.

[3] Jason recalls that $1.5 million was paid to Hutton from his personal account.

BACHNER & ASSOCIATES, P.C.

    Jason wired money from NECO to Haydee (and to many others) to pay their credit card bills.
3. Cash was withdrawn from NECO to pay for tickets. No money went for Jason (or Haydee's) personal use. For example, Jason withdrew from multiple Wells Fargo branches in Phoenix about $1.9 million in cash from January 26-30, 2015.[4] For the following Super Bowl in San Francisco, Jason withdrew about $1.3 million from various Citibank locations.
4. Many hundreds of thousands of dollars was also withdrawn weekly every March for Conference Championship week and the NCAA tournament.
5. Hundreds of thousands of dollars was withdrawn yearly to pay for US Open tennis tickets, normally in July and August.
6. Daily and weekly cash withdrawals have not been done by Jason since July, 2015. Either John DeMartino and/or the accounting department made these withdrawals mostly to purchase theatre tickets and other sporting season tickets (Knicks, Rangers, Giants, Yankees, etc.) These withdrawals, referenced in our sentencing memorandum, totaled roughly $100,000 a week (over $5 million annually).

    b. **Haydee Nissen's disbursements totaled $3,815,145, with $955,310 during the relevant time period.**

Over a year ago, Jason's bankruptcy counsel, David Wander, Esq., of Davidoff Malito, Hutcher, submitted Haydee's bank records to the Trustee. I am informed that the records showed that each monthly wire into her account was expensed for her AMEX payment in that same amount. No issue has ever been raised by the Trustee.[5] Most remarkably is that both the government and the trustee know that Haydee was left with almost $100,000 in credit card charges on her two AMEX cards for ticket purchases when Jason resigned. Jason, well aware of this problem prior to his resignation, made no effort to pay Haydee's (or his father's) charges not wanting to give his family priority over others owed money on their credit cards for ticket purchases.[6]

    c. **$1,369,675 disbursed at various casinos, with $326,837 during the relevant time period.**

The casino disbursements during the relevant time period were for ticket purchases. However, some background to this claim is necessary.

Between 2013 and 2017, NECO set up an office in the Harrah's hotel and casino for three events - Super Bowl XLVII, played in New Orleans in February 2013;

---

[4] Jason was accompanied by retired armed police officers hired as security.
[5] When Jason was terminated by NECO, all of Haydee's credit card statements used to make ticket purchases were left in the possession of the accounting department.
[6] Jason's father has taken out a $150,000 line of credit to pay the credit card charges.

3

BACHNER & ASSOCIATES, P.C.

and both NBA All Star games in 2014 and 2017. NECO banked in Citibank. In New Orleans, the banks were Chase and Whitney Bank. Accordingly, NECO could not withdraw cash in New Orleans. Jason did not want to fly with over $1,000,000 in cash on his person since in March 2012, Jason and other NECO members were detained by TSA when they landed in New Orleans for the Final Four in possession of hundreds of dollars in cash to buy tickets. So, in 2013, for the Super Bowl, Jason arranged with Harrah's in New Orleans to allow NECO to wire the money to the casino and then withdraw it to buy tickets for these events.[7] In 2014, and 2017, Jason and Harrah's conducted business in the same way.[8]

### d. Disbursements to Todd's Jewelry Co., in the amount of $768,300 with $300,000 during the relevant time period.

No money was spent on jewelry. Indeed, Jona Rechnitz, the government's cooperating witness in the Seabrook trial, introduced Jason to Alex Todd of Todd Jewelry (and Taly among others) because Alex and his brother:

- owned Knicks' courtside tickets located in section 4, valued at $800 per ticket, or $1600 per game, totaling $70,400 per season.
- The Todds sold $3,600 per ticket Celebrity row "on the wood seats," through their connection to Roc Nation.
- Through their connection to Roc Nation they also sold seats to Beyoncé concerts, Rihanna concerts, and Miguel Cotto fights. [9]

Thus, an overwhelming majority of the NECO payments to Todd Jewelry were for tickets.[10]

---

[7] Harrah's accommodation was not altruistic. After Jason paid the athletes for the tickets in Harrah's, most of them proceeded to gamble at Harrah's tables.

[8] Jason told the government and the Trustee that from 2011 to 2017, he lost around $100-150K gambling–most of it to his recollection before 2015. In exchange for gambling, NECO's trips to Harrah's and Vegas were "comped" for major events like: the ticket broker conventions; the Mayweather vs Pacquiao, Mayweather vs Hatton, Mayweather vs Alvarez and Cotto vs Margarito fights; rooms; meals; transportation in the city and to and from the airport. Savings to NECO were well in excess of the amounts lost.

[9] The Todds, through their associate "Gabe," also introduced Jason to Floyd Mayweather who bought tickets from NECO (as did the Todd brothers.)

[10] However, Jason suspects that one or two payments were paid on Rechnitz's behalf (prior to 2015) for commissions he was owed for his lender introductions. Jason is confident that other than a watch he bought for Haydee in 2015, since 2011, the only jewelry worth over $2,000 he bought for his wife was a pair of earrings Jona Rechnitz got for him in 2014; Haydee's engagement ring in 2013, which he bought from Taly; and their wedding bands which were also bought from Taly in 2014. Ironically, only 2 weeks

4

BACHNER & ASSOCIATES, P.C.

We will be ready to address any further questions during the Court conference in the morning.

Respectfully submitted,

Michael F. Bachner

MFB/jl

---

prior to Jason's fateful May 2017 meeting with Yaron Turgeman, he left Haydee's wedding band with him for repair. Turgeman still has it.