

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007

July 29, 2019

**BY ECF**

The Honorable Paul A. Engelmayer
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

    Re:    <u>United States v. Jason Nissen</u>, 17 Cr. 477 (PAE)

Dear Judge Engelmayer:

    The Government and defendant Jason Nissen respectfully submit this joint letter in connection with the sentencing in the above-captioned case.

    As directed by the Court, the Government has undertaken an examination of "whether the defendant and/or his family received any personal financial benefit from any part of the more than $71 million in funds the defendant fraudulently obtained." (Order dated Sept. 19, 2018 (Dkt. Entry No. 51) at 1.) This letter summarizes the Government's examination and findings and, in section IV, sets forth the defendant's views.

    As described in more detail below, the Government's investigation has revealed that although the overwhelming majority of the defendant's expenditures were business-related, he caused over $1 million in expenditures that were most likely personal in nature, and he clearly benefited personally from the lifestyle his ticket business allowed him to enjoy, which included staying at luxury hotels, attending premium sporting events, and gambling with company funds at high-end casinos. This over $1 million in personal expenditures was in addition to the salary payments the defendant received from his company, National Events Holding Company ("NECO"), between July 2015 and April 2017, which amounted to $360,000 annually. Finally, the investigation has shown that the defendant thoroughly commingled his business and personal interests, thereby making a comprehensive allocation of personal and business expenses nearly impossible. While not disputing that he and his family personally benefitted from the vast majority of these transactions, the defendant maintains that these transactions should be offset by money owed to him by NECO.

## I. Background

In advance of the defendant's sentencing, originally scheduled for September 21, 2018, the Court received a victim impact statement from Taly USA Holdings Inc. asserting, among other things, that "it is obvious to all that Jason Nissen has hidden a huge amount of money, likely in the Caribbean Island from which his young new wife hails" and "[t]here is little question that as soon as he is released from prison, Mr. Nissen will be living 'La Vida Loca' in a tropical paradise." (Dkt. Entry No. 48 at 1.)  The statement also asserted that "it is now a known fact that Jason Nissen withdrew close to *ten million dollars in cash* from the bank and cannot account for this money." (*Id.*)  The Court directed the Government to submit a letter addressing "[w]hat became of the more than $71 million in fraud proceeds." (*Id.*)

The next day, the Government responded by providing "a rough analysis conducted on a compressed timetable over the past 24 hours" which relied on information provided by Kroll, a respected investigations firm, which had been retained by Ronald Friedman, Esq., counsel to the trustee assigned to the bankruptcy proceedings involving the defendant's companies. (Dkt. Entry No. 50.)  The defendant also submitted a letter setting forth his position that Taly's claims were false and malicious. (Dkt. Entry No. 49.)  The Court then issued an order, noting that "the extent (if any) to which the defendant and/or his family personally benefitted from the defendant's more than $71 million fraud presents a significant unresolved question that prevents the Court from responsibly imposing sentence in this case" (Dkt. Entry No. 51 at 3), and advising that in lieu of sentencing the defendant on September 21, 2018, the Court would "take up preliminary matters to a sentencing proceeding" and would determine "a reliable method for answering the open factual question above as to the extent of personal benefit" (*Id.* at 3-4).

On September 21, the parties appeared before the Court.  The Court "adopt[ed] all factual recitations set forth in the presentence report other than as to the tax returns in paragraph 110."[1] (*See* Transcript of Sept. 21, 2018 hearing (Dkt. Entry No. 54) at 16.)  The Court confirmed that the parties were in agreement as to the fraud loss amount, and thereupon "accept[ed] the guideline calculation within the presentence report," yielding an "advisory guideline range [of] 97 to 121 months' imprisonment." (*Id.* at 18.)  The Court and the parties then addressed the Court's question regarding how the proceeds of the defendant's fraud were ultimately used, and the Government stated that it would retain Kroll or another forensic accounting firm to assist in investigating that issue.

## II. Overview of Government's Examination

The Government retained Kroll to conduct a forensic analysis of the proceeds of the defendant's fraud.  The Government provided Kroll with all of the relevant financial records

---

[1] Defense counsel has now provided the Government and the Probation Office with the defendant's tax returns for years 2015 through 2017.

Hon. Paul A. Engelmayer
July 29, 2019
Page 3 of 13

obtained in the course of the Government's investigation, and worked with Kroll to identify additional records pertinent to Kroll's task, which the Government then obtained and provided to Kroll. The Government also requested and obtained certain records from the defense. Ultimately, Kroll's review encompassed, among other things, bank records of personal accounts for the defendant, the defendant's wife, the defendant's father, and various NECO entities; accounting system records; NECO's Point of Sale system; and bank and credit card statements. The period of review ran from June 2015 to the collapse of NECO and the defendant's arrest in May 2017.

Kroll performed a review of transactions, focusing in particular on transactions that appeared to involve a potential personal benefit to the defendant or his family members. Kroll thus examined transactions coded in the accounting system as potentially pertaining to the defendant, transactions potentially pertaining to the defendant's wife and father, as well as transactions pertaining to various casinos and a Manhattan jewelry store, "Todd's Jewelry." The Government and Kroll also met and spoke with the defendant and his counsel multiple times in order to review Kroll's preliminary findings and obtain the defendant's explanation for various transactions and entries in NECO's books and records. As Kroll obtained additional records and refined its conclusions regarding which transactions likely resulted in a personal benefit for Nissen or his family members, the Government shared the transactions at issue with the defense to enable them to analyze them and provide the Government with any explanations or relevant information.

### III.    Government's Findings

In short, Kroll found that the majority of the transactions it analyzed—approximately 94 percent of the aggregate dollar amount of such transactions—were most likely business-related expenditures. Nonetheless, the defendant and his family personally benefitted from the fraud. The defendant does not dispute that certain transactions, as detailed below, personally benefitted him and his family, but he claims that from 2012 to 2015, he did not cash his "personal payroll checks" that he received from NECO and was thus justified in offsetting this money owed to him by having NECO pay for certain personal expenses.

The Government confirmed, through Kroll's review of NECO records and interview of NECO's former Chief Financial Officer, John DeMartino, that it is true that prior to 2015, the defendant did not cash various checks issued by NECO to another of the defendant's companies, National Events of America, Inc. ("NEA"). These uncashed checks totaled approximately $423,975 as of December 31, 2015. DeMartino thus created an "account payable" in NECO's books, reflecting that the defendant was owed $423,975. Over the following years, this balance was adjusted to account for certain (but not all) expenditures by NECO on the defendant's personal behalf. At the time of the defendant's arrest in May 2017, the balance in this account was $257,941. Thus, assuming *arguendo* that these uncashed paychecks should be subtracted from the

Hon. Paul A. Engelmayer
July 29, 2019
Page 4 of 13

amount by which NECO personally benefited the defendant, the offset would be limited to $257,941.[2]

The Government does not agree that, in calculating the extent to which NECO personally benefited the defendant, it is appropriate to offset these funds that were ostensibly owed to the defendant. The defendant, like any small business owner, reasonably decided to leave money in his business, hoping to thereby grow the business and realize greater returns in the future. That strategic decision cannot possibly justify a decision to use his business to pay various personal expenses.

The defendant's claim that he was entitled to have NECO pay for his personal expenses reflects a larger issue with the way in which the defendant ran his business: namely, that the defendant's business and personal interests were largely commingled and intertwined. Indeed, Kroll identified numerous instances of such commingling—including, for example, as detailed below, using the business to pay for personal expenses and using personal credit cards to pay for both personal and business expenses—which made Kroll's review inherently more challenging.

Kroll reviewed approximately $17.76 million in transactions (approximately 2,036 separate transactions) from between June 11, 2015 through June 11, 2017 to determine if they personally benefited the defendant and/or his family, or if they were business-related. These transactions were selected because they were identified in the NECO accounting system and bank records as potentially attributable to the defendant or his family.

Notably, due to the cash-intensive nature of the defendant's ticket resale business, there were hundreds of other cash deposits and disbursements—totaling in the millions of dollars—that were not identifiable or attributable to specific entities or individuals. As a result, these other cash transactions were not included in this analysis of transactions pertaining to the defendant.

---

[2] In mid-2015, DeMartino put an end to NECO issuing paychecks to NEA. Instead, from approximately July 2015 until the collapse of NECO in May 2017, NEA received direct deposits from NECO of $30,000 per month, totaling $360,000 annually. There is no dispute that these funds were received by the defendant, and thus would not factor into any offsetting of personal expenditures.

Hon. Paul A. Engelmayer
July 29, 2019
Page 5 of 13

Kroll determined the following:

(1) Approximately $564,349 (400 transactions) were—to a high degree of confidence—personal expenditures;

(2) Approximately $16.71 million (1,602 transactions) were—to a high degree of confidence—business-related; and

(3) Approximately $483,670 (three transactions relating to Mandalay Bay casino) were likely personal expenditures.[3]

### A. **Personal Expenditures**

The transactions in the first category—those that Kroll determined with a high degree of confidence were personal expenditures—included disbursements to the defendant, which were then used to fund subsequent personal expenditures in the amount of $340,254. Approximately 64 percent of this total included expenditures related to the purchase and acquisition of the defendant's home in Roslyn Heights, New York, while much of the remainder was used for the defendant's alimony and child support obligations.

As noted above, the defendant does not dispute that these transactions were personal in nature, but claims that he was entitled to use company funds to pay personal expenses because of the checks to NEA from NECO between 2012 and 2015 that the defendant had declined to deposit. In any event, as noted above, at the time of the defendant's arrest in May 2017, the balance in the defendant's payable account was $257,941, which would not have offset the entirety of the defendant's personal expenditures.

This personal-expenditures category also included credit card activity by the defendant's wife in the amount of approximately $156,595, which included various purchases that appear to be obviously personal in nature, such as exercise-related expenses (*e.g.*, Peloton bike equipment, Pilates classes), retail items (*e.g.*, Christian Louboutin, Bloomingdales, Amazon, Nordstrom, Zara), as well as utilities and food expenses. The defendant does not dispute the personal character of most of these expenses, but claims, again, that the vast majority of them should have been offset by the uncashed checks to NEA.

Lastly, this category also includes a $60,000 cash withdrawal made in May 2017—shortly before the defendant's arrest—coded in NECO's books as "Due from Jason Nissen." The defendant told the Government and Kroll that he withdrew this money to pay three employees who were owed money for tickets they had purchased for the business. Kroll has not identified any

---

[3] Approximately $3,383 in transactions have not been classified due to a lack of available records at present.

documentation that supports or corroborates that this withdrawal was indeed to pay back the defendant's employees. Indeed, DeMartino advised the Government and Kroll that he (DeMartino) had intended to use that $60,000 for employee salaries, and that the defendant gave no explanation for withdrawing those funds shortly before his arrest.

### B. Business Expenditures

As noted above, Kroll determined, to a high degree of confidence, that the overwhelming majority of the transactions it reviewed were business-related—indeed, over $16.68 million of the $17.76 million in transactions under review.

A review of these transactions provides insight into the manner in which the defendant ran his cash-intensive business. Approximately $14.7 million of the $16.68 million in transactions were loan-related and ticket-related expenditures, including approximately $1.8 million in transactions involving ticket-related brokers and organizations, and approximately $9.9 million in disbursements to certain investors/lenders, such as Taly USA Holdings, Inc., Hutton Ventures, and JSR Capital (a private real estate development and management company founded by Jona Rechnitz, a cooperating witness for the Government), and parties related to Rechnitz. Rechnitz invested in excess of $2.25 million and recruited others to invest in certain events for which the defendant was purchasing tickets. The defendant's payments to Rechnitz included approximately $1.5 million disbursed to pay off the credit card bills of Rechnitz and Rechnitz's family and associates. According to Rechnitz, and as confirmed by the defendant and Kroll's forensic analysis, Rechnitz had the defendant pay off Rechnitz-related American Express bills rather than pay Rechnitz back directly.[4] In order to do so, the defendant withdrew money from NECO entities or transferred money to his personal account, which was then used to pay American Express. Based on a review of Rechnitz's American Express statements, Kroll determined that nearly all of Rechnitz's credit card transactions which the defendant paid were personal, rather than NECO-related. For purposes of this analysis, however, Kroll classified these transactions as business-related expenses because the defendant paid off Rechnitz's personal credit card bills as a form of compensation for Rechnitz's involvement and investments in the defendant's ticket business.

Finally, the $14.7 million in transactions also consists of, among other things, (1) approximately $1.2 million in transactions that were incorrectly coded in the defendant's name in NECO's books—implying the defendant had benefited—but had been actually disbursed directly to various NECO entities; (2) $675,950 in transactions that were transferred or disbursed to Nissen that were then transferred or disbursed to NECO entities for business related activities; (3) employee-related disbursements; and (4) other business disbursements.

Kroll also reviewed certain cash transfers and withdrawals within NECO's Point of Sale

---

[4] In August 2019, Rechnitz testified in the trial of *United States v. Norman Seabrook*, 16-Cr. 467 (AKH), and admitted to engaging in this conduct with the defendant.

Hon. Paul A. Engelmayer
July 29, 2019
Page 7 of 13

("POS") system in connection with its forensic analysis. As discussed before the Court in September 2018, the Government understood from defense counsel that the POS records would reflect ticket purchases by the defendant equivalent to the amount of cash that the defendant was taking out of his business. Kroll reviewed the POS system to attempt to understand thirteen specific cash transfers or withdrawals that did not clearly identify the payees or business purposes. Kroll was unable to reconcile the cash amounts referenced in the POS records with transactions in the bank records because of the limited information and disjointed recordkeeping in the POS system. In light of its inability to reach a conclusive answer to the contrary and the defendant's explanation and recollection of various purchase and transaction histories, Kroll treated the thirteen transactions, which total $292,000, as business-related expenses. The Government notes, however, that the defendant had administrative rights to the POS system and Kroll has not fully examined the ticket purchasing, recording, and sales transaction processing capabilities of the POS system or usage histories of the NECO employees or the defendant. The Government further notes that the defendant acknowledged to Kroll that, at times, he provided falsified information, which was included in NECO's accounting system and records, to investors. The reliability of the POS records is, therefore, suspect.

Kroll reviewed disbursements related to the defendant's wife, Haydee Nissen—specifically, approximately $2 million in credit card charges from June 2015 through June 2017, for which NECO made payments to Haydee Nissen's personal checking account. Payments in corresponding amounts were then paid to American Express. As noted above, Kroll determined that approximately $156,595 of the $2 million in credit card charges were for personal expenses, but the overwhelming majority of the charges were ticket or business-related expenditures. In the course of conducting its review, Kroll also identified multiple NECO disbursements for American Express cards used by the defendant's father, Robert Nissen. Kroll determined that of the $4.2 million in new charges incurred by Robert Nissen between June 2015 and June 2017, approximately 99.4 percent of the charges were ticket or business-related expenditures.

In connection with its investigation, Kroll also examined expenditures related to Todd's Jewelry and various casinos. Kroll determined that such transactions (with the exception of Mandalay Bay, as detailed below) were business-related expenditures. Kroll identified invoices and emails establishing that NECO's payments in the total amount of $300,000 to Todd's Jewelry—which caters to athletic and entertainment clientele and also serves as a ticket broker—were for tickets. Similarly, Kroll identified emails and other documentation supporting that payments in the amount of $160,000 to Harrah's and $1,667 to Foxwoods (both casinos) in February 2017 were for tickets for specific events and related business expenses.

### C. Likely Personal Expenditures

The last category of expenditures consists of three disbursements to the Mandalay Bay casino, which Kroll could not determine, to a high degree of confidence, were either personal or business-related, but which Kroll assessed to be likely personal in nature. In short, the defendant

has explained that he incurred losses on his own personal gambling account and, in exchange, received complimentary items, including event tickets, meals, and luxury accommodations from Mandalay Bay. In other words, the defendant claims that by gambling significant amounts of NECO's money, he gained access to various perks, such as complimentary tickets he could then resell. The defendant further claims that the revenues generated from the sale of such complimentary tickets should offset his personal gambling or associated expenditures. Kroll classified the expenditures at Mandalay Bay as likely personal expenses, rather than strictly business-related or strictly personal expenses, in light of the riskiness of the gambling, the ambiguity of the awards compensation process, and lack of a clear link between the defendant's gambling and a legitimate business purpose.

Specifically, Kroll identified disbursements in the amount of $483,670 in total to Mandalay Bay, including (1) a $150,170 payment on July 14, 2015 from one of the NECO entities, National Event Company III, LLC ("NECO III"); (2) a $175,000 payment from NECO III on July 23, 2015; and (3) a $158,500 payment on December 15, 2015 from the defendant's overdrawn personal account, that was funded the following day by a $165,000 transfer from another NECO entity, National Event Company II, LLC ("NECO II").

The defendant has acknowledged that the July 14, 2015 and December 15, 2015 payments were associated with losses incurred on his own gambling account, but as noted above, he argues that his personal gambling had a substantial and intended positive impact on NECO since he and company employees received complimentary items. However, the Government submits that gambling losses, as well as unrecorded gambling gains, were not a likely or reasonable business-related occurrence and should not be included or relied upon as a business-related transaction.

Furthermore, Kroll received records from Mandalay Bay which showed that the compensation information and number of tickets allocated to the defendant differed greatly from the defendant's recollection. For example, he described receiving eight tickets to a high-profile Floyd Mayweather boxing match and claimed the income he received from the sale of those tickets should "offset" any gambling losses he incurred that were associated with the receipt of these tickets. The records, however, indicate that the defendant received only two tickets for this May 2015 event, not eight, and the defendant also admitted to Kroll that he and another individual attended this event, further undermining his claim.

Regarding the July 23, 2015 payment, the defendant told Kroll that he believed this payment was for another individual's account balance, suggesting that he had received tickets from this individual and that the defendant was paying that individual's gambling debt in return. The defendant was unable to recall the identity of the individual or the tickets that were received. Kroll's review of Mandalay Bay records showed that the payment was, in fact, for Nissen's account balance. Nissen ultimately acknowledged Kroll's findings on the $175,000 payment, which he admitted he confused with another payment concerning a different boxing match.

      Due to the nature of these expenses and the defendant's explanations, Kroll classified the expenditures at Mandalay Bay as likely personal expenses. In any event, whether these expenses were strictly personal in nature or related in some way to his ticket business, the nature and total ambiguity of these expenses (and potential unrecorded gains) necessitate that they not be classified as legitimate business-related expenditures.

* * *

      In sum, the Government submits that the evidence shows that the defendant committed a brazen multimillion-dollar fraud, resulting in over $70 million in losses to victims. In the main, however, he used the money that he obtained from his victims to purchase event tickets, to invest in the business, and to repay other victims. That said, we have determined that the defendant did indeed use approximately $1 million of the proceeds on expenditures that were most likely personal in nature, and his business activity allowed him to enjoy a cash-funded lifestyle of luxury and high entertainment. Although he claims, in essence, that he was owed (some of) this money due to certain "offsets," the Government does not agree that such offsetting is an appropriate business practice, and in any event, the nature of NECO's books and records make that argument virtually impossible to corroborate.

      The Government is prepared to conduct further investigation should the Court so direct.[5]

---

[5] The Government has not endeavored to respond to every argument raised by the defense, below. The Government respectfully submits that the remaining disputes of fact need not be material to the Court's sentencing determination. Of course, if the Court disagrees, the Government is prepared to respond in writing to each of the defense's arguments; to proceed to a *Fatico* hearing; or to undertake further efforts to try and reach a stipulation with the defense. The Government and Kroll will also be prepared to address each of the defense's arguments orally before the Court.

Hon. Paul A. Engelmayer
July 29, 2019
Page 10 of 13

### IV. **Mr. Nissen's Position**

a. Preliminary Remarks

The Government, with Mr. Nissen's complete cooperation, conducted a punctilious analysis of Mr. Nissen's business and personal expenditures at NECO, which confirms the defense's position that Mr. Nissen's crime was not intended for his personal enrichment. Indeed, from 2015-2017, Mr. Nissen incurred about $1,000,000 of personal expenses, amounting to only *1.4% of the $71 million NECO borrowed*. Moreover, as discussed later, the $1,000,000 in expense money was offset by Mr. Nissen's uncashed salary checks which he loaned to NECO to help the company meet its expenses, and contrary to footnote 2, above, by his salary which paid much of his personal expenses. The business perks Mr. Nissen and other NECO employees received were part and parcel of being in the entertainment/sporting event business. NECO employees stayed at luxury Las Vegas hotels because that is where their ticket-related events occurred and it is how their business relationships were established and cemented. As we established in our sentencing submission, Mr. Nissen comingled business and personal interests for legitimate business reasons. Many of the people/entities from whom NECO purchased its inventory would not accept payment from a ticket company. Accordingly, NECO (and its competitors) purchased these tickets by withdrawing millions of dollars in cash or by using the credit cards of friends, relatives and employees, who were then reimbursed by NECO. For example, from 2014 through 2016, the New York Yankees sold NECO through Mr. Nissen more than 60,000 Yankee Tickets for more than $3 million which were paid for full. The Yankees were fully aware that NECO (as did many other ticket brokers) purchased many of these tickets with personal credit cards belonging to third parties. This comingling of personal and corporate purchases was fully disclosed to Falcon during its due diligence review. Falcon thoroughly and meticulously audited NECO's books and records prior to extending its loan.

Below we address our disagreement with some of the Government's conclusions related to Mr. Nissen's personal expenditures. Regardless of these differences, it is clear from the Government's report that Mr. Nissen did not borrow the money to support a baroque or Gatsbyian lifestyle. Below we address our disagreement with parts of the Government's analysis related to Mr. Nissen's personal expenditures.

b. The Personal Expenditures

The government's examination concludes that Mr. Nissen incurred $1,040,519 in personal expenditures. The expenditures are broken down as follows:

1. $340,254.00, consisting of $216,000 for the purchase of his home, with the balance going to alimony and related personal expenses. Mr. Nissen does not dispute the personal nature of these expenses.

2. $156,595 in credit card charges incurred by Haydee Nissen, paid for by NECO. Mr. Nissen does not dispute these personal charges.

3. $60,000 withdrawn by Mr. Nissen from NECO's bank account on May 10, 2017. These funds were given by Mr. Nissen to three NECO employees who were owed money for ticket purchases they made for the company. The defense has provided the Government with the employees' names.

4. $483,670.00 in gambling losses incurred by Mr. Nissen. We do not dispute that these losses were personal. However, the $150,170.00 wire payment made on July 14, 2017 came from proceeds which were unrelated to the Falcon loan. In May 2015, Mr. Nissen travelled to Las Vegas for the Mayweather-Pacquiao fight. His investment partner in that fight was Murray Huberfeld. The documents subpoenaed by the Government from the Mandalay Bay Casino show that $1,000,000 was wired by Huberfeld's spouse to NECO. Mr. Nissen's $150,171.00 wire to Mandalay Bay came from those proceeds. NECO realized $400,000 in profit on the Mayweather tickets.

It is the defendant's position that the $1,049,000.00 of personal expenses claimed by the Government should be reduced by the $60,000 paid to the NECO employees and by the $150,170 paid from pre-Falcon funds, leaving $830,830 in personal expenditures over three years.

c. <u>Mr. Nissen's Personal Expenditures Should Be Offset Against Loans He Made to NECO and Salary He Received.</u>

John Demartino, NECO's former CFO, confirmed to the Government that from 2012-2015, Mr. Nissen received distribution checks from NECO made payable to NEA[6] totaling $423,975.00 which he did not deposit. Accordingly, these funds remained available to be used by NECO for business purposes. On December 31, 2015, Demartino recorded the $423,975 as a credit or increase to NECO's liabilities on the company's books.[7] In addition to the $423,975 owed to Nissen, from July 2015 through April 2017, Mr. Nissen received a $30,000 a month salary (guaranteed payments) totaling $660,000, which was deposited directly into Mr. Nissen's NEA account and used to pay his personal expenses.

The Government's analysis, however, of Mr. Nissen's personal expenditures fails to credit against that number either the uncashed distribution checks of $423,975 or his after-tax guaranteed

---

[6] NEA was a subchapter S corporation owned solely by Mr. Nissen which he used to pay his personal expenses.

[7] As of May 2017, when Mr. Nissen was arrested, the $423,975.00 credit was decreased to $257,941.00. That number was arrived at by deducting Haydee Nissen's credit card expenses of approximately $156,000 from the $423,975.00.

Hon. Paul A. Engelmayer
July 29, 2019
Page 12 of 13

salary of approximately $500,000. When credited against the personal expenditures of $830,830, Mr. Nissen actually has a credit balance in the amount of $93,145.00.  In addition, Haydee Nissen and Robert Nissen were left by NECO with credit card charges for ticket purchases in the amount of $75,953.74 and $197,000, respectively. Jason Nissen bears the obligation for repaying those costs.

   d. Conclusion

The very thorough examination of Mr. Nissen's personal expenditures completely rebuts the malicious allegation made by investor Taly that Jason Nissen likely stole and secreted close to ten million dollars in an offshore location with his "young new" "Caribbean" wife.  Surely, Jason Nissen committed a desperate, albeit substantial fraud, to try and save the company he founded in 2006 and which he funded from 2006-2012 with a $2.8 million personal investment representing virtually his entire savings - all of which has been lost.  Kroll's forensic analysis, completed with Mr. Nissen's full cooperation, confirms that NECO was a legitimate business.  Indeed, just prior to its bankruptcy, NECO's business grew to more than $80 million in annual revenues.  Almost every nickel raised by Nissen from the victims in this case was used by him in a misguided effort to keep NECO running, and not to enrich himself.  Mr. Nissen deeply rues the fact that he harmed his investors and knows that he is responsible for that harm. His sentence, however, should fairly reflect that his motives were not predatory but rather based upon a firmly held but ultimately quixotic belief that NECO could succeed.

Hon. Paul A. Engelmayer
July 29, 2019
Page 13 of 13

          Respectfully submitted,

          GEOFFREY S. BERMAN
          United States Attorney

By:   /s/
          Lara Pomerantz / Douglas S. Zolkind
          Assistant United States Attorney
          (212) 637-2343 / 2418


          BACHNER & ASSOCIATES, P.C.


By:   /s/
          Michael F. Bachner, Esq.
          39 Broadway, Suite 1610
          New York, NY 10006
          T: (212) 344-7778
          F: (212) 344-7774
          Email: mb@bhlawfirm.com
          Attorneys for Defendant Jason Nissen